FILED
2015 Jul-08  PM 04:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | |
|---|---|
| LADYE GARRETT HOGSED, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 5:14-cv-00798-JEO |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner, Social Security | ) |
| Administration, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Plaintiff Ladye Garrett Hogsed brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final decision of the Commissioner of Social Security ("Commissioner") finding that she is not disabled under the Social Security Act. (Doc. 1).[1]  The case has been assigned to the undersigned United States Magistrate Judge pursuant to this court's general order of reference. The parties have consented to the jurisdiction of this court for disposition of this matter.  (Doc. 5).  *See* 28 U.S.C. § 636(c), FED. R. CIV. P. 73(a).  Upon review of the record and the relevant law, the undersigned finds that the Commissioner's decision is due to be affirmed.

---

[1] References herein to "Doc. ___" are to the electronic numbers at the top of each pleading that are assigned by the Clerk of the Court.

## I.  PROCEDURAL HISTORY

Plaintiff filed for disability insurance benefits on September 29, 2010.  (R. 77, 134-35).[2]   The application was initially denied by the State Agency.  (R. 87-89). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (R. 95-96).  Plaintiff, her counsel and a vocational expert ("VE") attended the hearing on May 15, 2012.  (R. 42-76).  The ALJ issued a decision on August 13, 2012, finding that Plaintiff was not entitled to benefits.  (R. 21-41).  The Appeals Council denied Plaintiff's request for review on February 27, 2014.  (R. 1-7).  On that date, the ALJ's decision became the final decision of the Commissioner.  Plaintiff then filed this action for judicial review under 42 U.S.C. § 405(g).  (Doc. 1).

## II. STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The function of the court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422, 28 L.Ed.2d 842 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). This court must "scrutinize the record as a whole to determine if the decision reached is reasonable

---

[2]References herein to "R. ___" are to the administrative record located at Document 3 (Answer of the Commissioner).

and supported by substantial evidence." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* It is "more than a scintilla, but less than a preponderance." *Id.*

The court must uphold factual findings that are supported by substantial evidence. However, it reviews the ALJ's legal conclusions de novo because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993). If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, it must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991)

## III. STATUTORY AND REGULATORY FRAMEWORK

To qualify for disability benefits and establish his or her entitlement for a period of disability, a claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder. The Regulations define being "disabled" as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than twelve (12) months." 20 C.F.R. § 404.1505(a). To establish entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508.

The Regulations provide a five-step process for determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i-v) and 416.920(a)(4)(i-v). The Commissioner must determine in sequence:

(1) Is the claimant presently unemployed;

(2) Is the claimant's impairment severe;

(3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1 [the "Listings"];

(4) Is the claimant unable to perform his or her former occupation;

(5) Is the claimant unable to perform any other work within the economy?

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir.1986). An affirmative answer to any of the above questions leads either to the next question or, at steps three and five, to a finding of disability. A negative answer to any question, other than step three,

leads to a determination of "not disabled."  *Id.*; *see* 20 C.F.R. §§ 404.1520 and 416.920.

## IV.  FINDINGS OF THE ALJ

Plaintiff was 54 years old at the time of the ALJ's decision.  (R. 36). She has past relevant work experience as a pharmacy technician.  (R. 36, 70).  Plaintiff alleges she has been unable to work since February 2, 2009, due to severe and chronic neck pain which radiates into her right arm and hand, causing numbness, tingling, and weakness; back pain, resulting in numbness and tingling in her right foot; fatigue; daily headaches; hot flashes; depression; and anxiety.  (R 28).

Following a hearing, the ALJ determined Plaintiff was "not disabled."  (R. 37). The ALJ found that Plaintiff had severe impairments of osteoporosis; degenerative disc disease of the cervical spine; depressive disorder; anxiety disorder; and adjustment disorder.  (R. 26).  The ALJ also found that Plaintiff's mental impairments, whether considered singly or in combination, did not meet one of the impairments listed in 20 CFR Part 404.  (R. 27).  The ALJ further found that Plaintiff had the residual functional capacity ("RFC") to perform light work with limitations. (R. 28).  Finally, the ALJ determined, premised on the testimony of the VE), that Plaintiff could perform her past work as a pharmacy technician.  (R. 36).

## V.  DISCUSSION

Plaintiff claims the decision of the ALJ is due to be reversed and benefits awarded to her or the decision remanded for "further proper consideration" because the ALJ "failed to properly evaluate the opinion [evidence] from Plaintiff's treating physician, Dr. [Chad] Bradford."  (Doc. 8 at 9).  The Commissioner argues that this contention is without merit and that the ALJ's assessment of the medical opinion evidence is supported by substantial evidence.  (Doc. 9 at 4-13).

### A.  Dr. Bradford's Opinion

The record contains three relevant documents from Dr. Bradford.  The first is a letter dated April 19, 2011, noting that Plaintiff suffers from lumbago, degenerative disc disease, osteoporosis, osteoarthrosis, bipolar disorder and depression.  (R. 329).  In the letter, Dr. Bradford concludes, "Due to [Plaintiff's] physical and psychological conditions, I do not feel she is able to work and [is] in need of complete disability."  (*Id.*)  The second document is a "Clinical Assessment of Pain" form dated June 2, 2011.  (R. 332-33).   In the Clinical Assessment form, Dr. Bradford, selecting from multiple-choice responses, states that Plaintiff had pain and that it was intractable and "virtually incapacitating"; that physical activity would "[i]ncrease [her] pain to such an extent that bed rest and/or medication is necessary;" that her pain and medicine "side effects could be expected to severely limit her effectiveness due to distraction,

6

inattention, and drowsiness"; and "that previous treatments for her pain have been temporary and ineffective." (R. 34, 332-33). The third document is a "Medical Source Opinion (Physical) ("MSO")" form that is also dated June 2, 2011. (R. 334-35). In the MSO, Dr. Bradford states that Plaintiff's chronic pain limits her to standing, walking, and sitting less than one hour in an 8-hour work day.[3] (R. 334). According to Dr. Bradford, she would need to lie down three times for thirty minutes each during the work day. (*Id*.) She would only be able to lift five pounds occasionally and carry two pounds occasionally. Other restrictions would include no pushing and pulling with her right arm or right leg; no climbing, balancing, stooping, kneeling, and reaching; occasional pushing and pulling with her left arm and leg; and occasional crouching, crawling, fingering, and feeling. (*Id*.) Dr. Bradford also concludes that Plaintiff should never be exposed to extreme cold or heat, be in

---

[3]Plaintiff asserts that Dr. Bradford limited her to standing and walking less than ten minutes a day and sitting less than 40 minutes per day. (Doc. 8 at 6). The Commissioner counters that Dr. Bradford's notations that Plaintiff could stand and walk for "‹1°" and sit for "4°" indicates Plaintiff could stand for less than 1 hour and sit for 4 hours. (Doc. 9 at 11, n. 2). The Commissioner also notes, without citation to any authority, "In the medical field, the degree symbol (°) is used to represent hours, not minutes." (*Id*.) Although the court could find no authority supporting the use of the (°) symbol specifically in the medical field, it is aware of its use in various scientific and engineering fields. *See* http://graphicdesign.stackexchange.com/ questions/27150/how-to-denote-time-is-it-ok-to-use-degree-and-prime-symbols (last visited July 2, 2015).

Elsewhere on the MSO, Dr. Bradford notes that Plaintiff should not be required to sit for prolonged periods as she is "unable to recover fully after long periods of sitting or standing." (R. 335).

proximity to moving mechanical parts, work in high exposed places, or drive automotive equipment. (R. 335). Plaintiff argues, "If given credible weight, the opinion of Dr. Bradford would render Plaintiff incapable of performing work-related activities due to the severity of [her] symptoms and limitations...." (Doc. 8 at 11).

## B. Guiding Principles

The Commissioner is responsible "for making the determination or decision about whether [a claimant] meet[s] the statutory definition of disability." 20 C.F.R. § 404.1527(d)(1). Thus, "the Commissioner, not a claimant's physician, is responsible for determining whether a claimant is statutorily disabled." *Denomme v. Comm'r, Soc. Sec.*, 518 F. App'x 875, 877 (11th Cir. 2013) (citing 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1)). Additionally, the regulations provide guidance on the weight to be given to opinions from treating sources. "[T]he medical opinion of a treating source is entitled to controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence' in the record." *Szilvasi v. Comm'r, Soc. Sec.*, 555 F. App'x 898, 900 (11th Cir. 2014) (citing 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Similarly, the opinion of a treating physician is entitled to more weight than the opinion of a non-treating physician. *Ryan v. Heckler*, 762 F.2d 939, 942 (11th Cir. 1986). The ALJ may reject any medical opinion if the evidence supports a contrary

finding. *Sharfarz v. Bowen*, 825 F.2d 278, 280 (11th Cir. 1987) (citing *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985)). However, the opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Broughton v. Heckles*, 776 F.2d 960, 961-62 (11th Cir. 1985)). "Good cause" exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004). When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate his or her reasons. *Id.*

### C. Analysis

### 1. Dr. Bradford's Opinion Was Not Bolstered by the Evidence

According to Dr. Bradford, Plaintiff cannot work because of her physical and psychological conditions; because of her intractable and "virtually incapacitating" pain; because her pain is exacerbated by physical activity; because her pain and medicine "side effects could be expected to severely limit her effectiveness due to distraction, inattention, and drowsiness"; because her "previous treatments for ... pain have been temporary and ineffective"; and because her pain limits her ability to stand,

walk, and sit in an 8-hour work day. (R. 332-35). However, before the ALJ were multiple reports and records from other doctors that do not support Dr. Bradford's conclusion that Plaintiff was completely disabled. Additionally, Dr. Bradford's opinions contain inconsistencies. Each point will be addressed separately below.

### a. Other Evidence

First, the court notes that the opinions of Dr. Bradford, who is not a treating specialist, are contrary to the treatment notes from Plaintiff's treating specialists, Dr. Steven Ganzel and Dr. Ki-Hon Lin. On January 27, 2010, approximately one year after Plaintiff's disability onset date in 2009, she saw Dr. Ganzel, a physical medicine and rehabilitation specialist, with complaints of cervical pain. (R. 232). She reported having intermittent right upper extremity pain over the last several years, which had been successfully treated with medication. (*Id*.) She also reported that she was "very active at the gym" and that approximately two weeks earlier she had experienced "a new pain after a workout, ... located at the base of her neck and across the top of her shoulders, right greater than left...." (*Id*.; *see also* R. 240 ("Pt. reports ... she thinks she 'overdid it' at the gym")). A January 29, 2010 MRI revealed "mild retrolisthesis of C5 on C6 ... due to disc space narrowing," which was described as advanced degenerative disc disease. ( R. 230). The MRI also revealed "mild C4-5 and C6-7 degenerative disc disease." (*Id*.)

10

Plaintiff was referred to Dr. Lin for surgical consideration. (R. 236). Dr. Lin determined that Plaintiff had displacement of her cervical intervertebral disc without myelopathy and cervical radiculitis. He also found no focal motor deficits in her upper extremities. (R. 238). He discussed Plaintiff's treatment options with her, including physical therapy ("PT"), medications, injections, and surgery. (*Id*.) He ordered PT two times a week for six weeks and a prescription for prednisone. Plaintiff was scheduled for a three week follow-up appointment. (R. 239).

Plaintiff began PT on February 8, 2010. She appears to have attended only six sessions through March 2, 2010. The records show that her situation improved. The February 10, 2010 PT notes state that Plaintiff reported that "her neck is feeling a little better." (R. 242). They also indicate that Plaintiff "tolerated treatment well." (*Id*.) The February 18, 2010 notes state that Plaintiff reported that "she is feeling much better with decreased pain." (R. 244). She again tolerated the treatment well and had an increased range of motion. (*Id*.) The February 22, 2010 notes state that Plaintiff was "not having the pain like she was." (R. 246). She also denied any increase in pain with exercise. (*Id*.) The February 24, 2010 notes provide that Plaintiff reported that "she is feeling much better." (R. 248). Additionally, they reflect that she tolerated the treatment well. (*Id*.)

The February 25, 2010 notes from Plaintiff's follow up examination by Dr.

11

Ganzel state, in pertinent part:

> Patient reports no pain today and denied tingling/numbness and radiating pain. She states that PT has helped tremendously, and she now is in a fully functional level and has no trouble sleeping. She states she has not required any pain medications, and only takes Flexeril occasionally.

(R. 250). His examination of Plaintiff revealed that she had normal contour of her cervical spine; minimal right trapezial tenderness, no muscle spasms, no midline tenderness, and no stepoffs; her range of motion was not limited; she had no focal motor deficits in her upper extremities; her sensation was intact; and she had a negative Spurling's test.[4] Plaintiff was scheduled for a follow up visit in six weeks. (R. 251).

Plaintiff's last PT session appears to have been on March 2, 2010. Plaintiff reported that her neck was "bothering her some today." (R. 252). The notes further reflect that Plaintiff tolerated the treatment well and reported decreased pain. (*Id*.) A follow up visit was scheduled. (*Id*.) There is no evidence Plaintiff returned for further treatment. The ALJ properly concluded that the evidence demonstrated that Plaintiff's treatment was successful in improving her pain. (R. 30).

It is evident that Dr. Bradford's statement are contrary to the notes of Drs.

---

[4]Spurling's test is an evaluation for cervical nerve root impingement. (*See* http://www. medilexicon.com/medicaldictionary.php?t=908).

Ganzel and Lin.  In evaluating the inconsistencies, the undersigned recognizes that their notes and the PT notes precede Dr. Bradford's statements by over one year. However, they constitute hard evidence that refutes Dr. Bradford's conclusroy statements. For instance, he states that Plaintiff's pain is intractable and "virtually incapacitating," it is exacerbated by physical activity, and her previous treatments have been temporary and ineffective.  Each of these conclusions is refuted by the foregoing medical notes and findings.  The ALJ correctly found that Dr. Bradford's statements in the Clinical Assessment of Pain form were in conflict with the other evidence and, therefore, due to be "given little weight."  (R. 34).

Dr. Ganzel's findings are supported by other evidence, including Plaintiff's February 18, 2010, physical exam by her OBGYN doctor, Dr. Donna R. Graf, who noted that Plaintiff was "well-developed," "well-nourished," and "in no apparent distress." (R. 354).[5]  On November 17, 2010, Plaintiff was examined by Dr. Bobby Johnson at Endocrinology & Diabetes Association.  He noted Plaintiff "still has fatigue" which is an "associated symptom[]" of  Plaintiff's hypothyroidism.[6]  (R.

_____

[5]A March 12, 2010 note states that Plaintiff called concerning "stress and anxiety" (R. 354); however, it is not listed as debilitating.

[6]Dr. John B. Abell's notes from March 9, 2009, provide that Plaintiff complained of "[e]xcess fatigue."  (R. 279).  However, on May 7, 2009, he noted that while Plaintiff "still has fatigue in the afternoons," her "energy is much improved in the morning" and "her hot flashes have resolved."  (R. 269).

293).  Plaintiff's general exam results indicate nothing debilitating and the only direction to Plaintiff was to stop taking "Armor Thyroid."  (R. 294).  In a follow up visit with Dr. Johnson on January 4, 2011, he noted that Plaintiff has "felt tired but has had a lot of stress in her life with death and accidents to loved ones."  (R. 295). Again, the general examination results listed nothing debilitating, and Dr. Johnson's directives only related to medications – not physical activities.  (R. 296).  There is no evidence that Plaintiff returned to Dr. Johnson for further treatment.  (R. 32).

Additionally, Dr. Bradford's opinions are also inconsistent with the findings of consultative examiner Dr. Yonus Ismail.  On December 14, 2010, Dr. Ismail examined Plaintiff.  He noted Plaintiff's chief complaint as neck and shoulder pain. He observed that Plaintiff had a normal cervical spine with normal range of motion and no spasms or deformity, intact gross and fine manipulation, and full grip strength in her hands.  (R. 303).  His diagnosis listed chronic back and neck pain, degenerative disc disease of [the] spine, osteoarthritis, osteoporosis, depression, anxiety, hypothyroidism, and menopausal syndrome.  (R. 304).  He felt that occupational and physical rehabilitation would benefit Plaintiff.  (*Id*.)  The ALJ gave "some weight" to Dr. Ismail's his findings, "as they are generally consistent with the medical evidence of record."  (R. 34).

Dr. Mary Arnold, a licensed psychologist, conducted a consultative

14

psychological examination of Plaintiff on December 28, 2010. Dr. Arnold noted that

Plaintiff "presents with history of opiate dependent pain" without surgery related to

"bone on bone herniated disks." (R. 300). The ALJ credited the following findings

of Dr. Arnold because they were supported by the medical evidence of record:

> The mental status portion of [Dr. Arnold's report states] that [Plaintiff's]
> appearance was good and her behavior was appropriate; her mood was
> subdued, but her affect was normal; her cognition and memory were
> normal; her fund of information and abstract reasoning were good; and
> her thought processing was good, with intellectual functioning estimated
> to be in the average range. [Plaintiff] reported normal daily activities
> including doing laundry; sharing cooking and cleaning with her
> husband; and shopping for groceries and other needed items. She also
> reported that she was able to drive an automobile, visit with family,
> using a computer to access the internet, and watch "true life crime
> shows" on television. She stated that she does not read as much as she
> used to, due to problems with focusing. Dr. Arnold noted that [Plaintiff]
> was not receiving mental health services, but she was driving 60+ miles
> for treatment of her physical impairments. ...   Dr. Arnold assessed
> [Plaintiff as] having ... adjustment disorder ... and a Global Assessment
> of Functioning (GAF) rating of 56.

(R. 33 (footnote omitted)). This evidence does not support Dr. Bradford's finding

that Plaintiff is totally disabled and incapable of working.

Dr. Samuel Williams, a non-examining State agency psychiatric consultant,

also assessed Plaintiff's mental status as of January 19, 2011. He notes in the

"activities of daily living" ("ADL") section of his report that Plaintiff stated that after

prolonged use of her right hand/arm she had pain and headaches. (R. 317). Dr.

Williams also states Plaintiff "prepares simple meals; does light household chores; goes out alone; drives; [and] shops." (*Id.*)  Additionally, while the report states Plaintiff has "problems with concentration; does not do well with following instructions; [and] does not do well at all with stress or changes in routine," Dr. Williams also notes that he found Plaintiff's statements regarding her limitations only "partially credible." (*Id.*)

Further, in a January 25, 2011 Mental Residual Functional Capacity Assessment review, Dr. Williams gave Plaintiff no mark lower than "Moderately Limited" in any functional category. (R. 319–22).  In addition, he found that Plaintiff was "capable of understanding, remembering, and carrying out simple instructions over [an] 8 hour work day with routine breaks," and "can concentrate for 2 hour periods." (R. 321).  He also noted that Plaintiff could have contact with coworkers, supervisors, and the general public in a "casual and nonconfrontational" environment and that changes in her work place could be made if "introduced slowly." (R. 321).

Thus, Dr. Bradford's opinion that due to Plaintiff's physical and psychological conditions, she is unable to work and in need of complete disability is not supported by the other evidence in the record.  The ALJ correctly weighed his statements as compared to the other medical evidence.

16

### b.  The Evidence Supported a Contrary Finding

There was substantial evidence that Plaintiff could perform her prior occupation or, alternatively, perform other work within the national economy.  As discussed above, there were no other medical findings of complete disability or extreme debilitating disease.   Furthermore, "[t]here are two avenues by which the ALJ may determine whether the claimant has the ability to adjust to other work in the national economy. The first is by applying the Medical Vocational Guidelines. *Phillips v. Barnhart*, 357 F.3d 1232, 1239 (11th Cir. 2004).  The other "is by the use of a vocational expert." *Id.* at 1240.  In order for a vocational expert's ("VE") testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments. *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002); *Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir.1999).

A VE testified during Plaintiff's hearing.  The ALJ posed four hypothetical situations to the VE.  In the first hypothetical, the ALJ asked the VE to consider a person of Plaintiff's education, training, and past work experience who is "limited to a maximum of a light range of work" as defined by the regulations. (R. 71).  The VE opined that a pharmacy technician "should be an option."  (R. 71).

In the second hypothetical, the ALJ carried over the hypothetical person's

17

education, training, and past work experience, but added that this person would be "limited to understanding and carrying out simple instructions; need to [have] only occasional, non-intensive interaction with coworkers and the general public; and he would be able to concentrate and remain on-task two hours at a time sufficient to complete an eight-hour work day." (R. 71). The VE answered affirmatively that this person could work as a pharmacy technician. (R. 72).

In a third hypothetical, the ALJ further limited the individual in standing and walking by needing to sit or stand one or two minutes, i.e. change positions, every hour in a work day. (R. 72). Here, the VE answered that these conditions would not be suitable in regards to Plaintiff's past relevant work (R. 72), but did answer that jobs such as a cafeteria cashier, ticket taker, or surveillance system monitor would accommodate a person with these limitations. (R. 73).

In a fourth hypothetical, the ALJ added the limitation the worker "would be expected to needing to miss work on average two days a month on a consistent basis." Only here did the VE opine that there would be no jobs to accommodate this limitation because it would not be tolerated. (R. 73).

Thus, by posing appropriate hypothetical questions to the VE, the ALJ properly determined Plaintiff was able to perform her former occupation of pharmacy technician or perform other work in the economy, and therefore she was "not

18

disabled."

### c.  Bradford's Opinion Was Conclusory

The ALJ stated that she gave no weight to Dr. Bradford's letter opining that Plaintiff was unable to work, because the opinion was conclusory on a matter reserved to the Commissioner.  (R. 34).  The Social Security regulations provide that "[w]e are responsible for making the determination or decision about whether you meet the statutory definition of disability....  A statement by a medical source that you are disabled or unable to work does not mean that we will determine that you are disabled." 20 C.F.R. § 404.1527(d)(1). *See also Bell v. Bowen*, 796 F.2d 1350, 1353-54 (11th Cir. 1986) ("The regulation in 20 C.F.R. § 404.1527 provides that although a claimant's physician may state he is 'disabled' or 'unable to work' the agency will nevertheless determine disability based upon the medical findings and other evidence.").

Plaintiff argues that the ALJ's decision was not based on substantial evidence, because the ALJ failed to contact Dr. Bradford to clarify his conclusions about her impairments.  (Doc. 8 at 12).  Plaintiff's argument is misplaced.  20 C.F.R. § 404.1520(b) states that the ALJ "may contact your treating physician, psychologist, or other medical source" when "the evidence is consistent but we have insufficient evidence to determine whether you are disabled." 20 C.F.R. § 404.1520(b). *See also*

*Sellers v. Colvin*, No. 5:13-cv-610-SLB, 2014 WL 4197402, at *3 (N.D. Ala. Aug. 18, 2014).

Here, as noted above, the medical evidence was sufficient to determine whether or not Plaintiff was disabled. The ALJ considered Dr. Bradford's statements in the context of the entire record. There was no need to further contact Dr. Bradford.

## 2. Dr. Bradford's Statements Were Inconsistent With His Records

Dr. Bradford's statement that "[d]ue to Plaintiff's physical and psychological conditions, I do not feel she is able to work and in need of complete disability," dated April 19, 2011, is inconsistent with his medical notes regarding Plaintiff's physical and/or psychological condition. He never used terms such as "disabled" or "unable to perform" in his physical examinations of Plaintiff. To the contrary, his notes reflect terms such as "normal," "moderate," and "unremarkable" when describing Plaintiff's physical condition.

### a. Plaintiff's Visits Before the April 19th Letter

Plaintiff had two recorded appointments with Dr. Bradford prior to the date of his letter. The first was on June 9, 2010, and the other was September 20, 2010. In notes from her June 9, 2010 visit under the History of Present Illness ("HPI") section, the purpose of the visit is described as an initial visit to establish care. (R. 290, 349). Most remarkably, the notes state, "[Plaintiff] is doing well." (R. 290, 394). Also,

20

while the notes record that the Plaintiff is "taking some chronic steroids for what sounds like adrenal fatigue," they also note Dr. Bradford's observation that "she is very healthy overall and does well with this."  (R. 290, 349).  Further, in the Review of Systems ("ROS") section,[7] Dr. Bradford notes Plaintiff as having "arthralgia" and "back pain."  (R. 290, 349).  Under the heading of "General," he notes that Plaintiff's condition was "unremarkable with exception of HPI."[8]  (R. 290, 349).  His "General Exam" notes state that Plaintiff's general condition is "normal" and that she "appears younger than [her] stated age."  (R 291, 350).

Dr. Bradford's September 20, 2010 notes reflect Plaintiff's HPI as "Sinusitis." (R. 288, 347).  The notes further state that Plaintiff reported being "affected by allergies and having exposure to others with [the] same symptoms."  (*Id.*)  Again, under the ROS section, Plaintiff's general condition is noted as "unremarkable with exception of HPI."  (R. 288, 347).  Also, Dr. Bradford's General Exam notes list Plaintiff's general condition as "normal." (R. 289, 348).

---

[7]"The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to uncover dysfunction and disease."  A Practical Guide to Clinical Medicine, hhtp://meded.usced.edu/clinicalmed/ros.htm (last visited July 2, 2015).

[8]"HPI" generally is the abbreviation for history of the present illness.  *See* hhtp://www. allacronyms.com/_medical/HPI/H (last visited July 2, 2015).

### b.  Records of Visits After Dr. Bradford's April 19th Letter

After the April 19th letter, Plaintiff was seen by Dr. Bradford six times.  In Dr. Bradford's June 2, 2011 notes he records Plaintiff's HPI as "Headache."  (R. 340, 345).   The notes further state that Plaintiff reported the pain to be "acute," "dull/aching," and "sharp/stabbing," and that she rated the pain as a "9 out of 10." The notes also reflect that she stated, "Intensity is ... moderate."  (R. 340, 345). Additionally, the ROS section notes Plaintiff's general condition as "unremarkable with exception of HPI."  (R. 340, 345).  Under the General Exam section, the notes record Plaintiff's condition as "normal" and that she "appears younger than stated age."  (R. 341, 346).

The July 12, 2011 notes reflect Plaintiff's HPI as "Anxiety."  (R. 338, 343). The duration of the anxiety is reported as "acute" and "worsening," especially in regard to "significant life events."   However, the notes also state, "Intensity is reported as moderate."  (R. 338, 343).  Again, the ROS notes record Plaintiff's general state as "unremarkable with exception of HPI."  (R. 338, 343).  Also, while it is reported in the General Exam section that Plaintiff was "crying on exam with lots of anxiety," it is also noted that Plaintiff's state was "normal."  (R. 339, 343).

The February 7, 2012 notes reflect the HPI as "Neck Pain" that is "generalized, in the bilateral cervical region, and in the right shoulder region."  (R. 414).  The notes

further state Plaintiff described the pain as "aching" and the duration as "continuous and acute." (R. 414). Plaintiff reported the "symptoms worsen with activities of daily life" such as "lifting, overhead activity, twisting, and working on computers." (R. 414). Additionally, Plaintiff reported the intensity as "severe" and "7-8/10 with worsening headaches." (R. 414). Dr. Bradford concluded, "Symptoms appear to be worsening." (R. 414). Associated symptoms are listed as "fatigue, headache, joint pain (multiple sites), numbness in arm, numbness in hand, numbness in leg, radiating pain, shoulder pain, sleep disturbances, and weakness in arm." (R. 414). Dr. Bradford notes that Plaintiff "does have some weakness in her right arm and numbness ... in her distal arm and legs." (R. 414). Additionally, the notes record that Plaintiff reported "symptoms improve with pain medications." (R. 414). Further, Dr. Bradford's ROS notes record that Plaintiff's general exam was "unremarkable with exception of HPI." (R. 414). His General Exam notes record Plaintiff as being "tired" but "in moderate pain." (R. 415). Plaintiff was diagnosed with idiopathic peripheral neuropathy. (*Id.*)

On March 1, 2012, Dr. Bradford notes Plaintiff's HPI as "Fatigue." (R. 422). While the notes record Plaintiff's report that the "symptoms do not improve with rest" and "worsen with activity," they also record Plaintiff as stating the intensity as "moderate." (R. 422). Again, Dr. Bradford's ROS assessment describes Plaintiff's

23

general condition as "unremarkable with exception of HPI" and the General Exam notes state she was "tired and in moderate pain." (R. 423). He did note, however, associated symptoms of "constipation, depression, dizziness, headache, insomnia, joint pain/arthralgia, joint swelling, and stress." (*Id.*)

On April 12, 2012, Dr. Bradford notes Plaintiff's HPI as "Neck Pain" that is "generalized, in the bilateral cervical region, and in the right shoulder region." (R. 419). Plaintiff described the pain as "aching" and the duration of the pain as "continuous and acute." (R. 419). Plaintiff reported "symptoms worsen with activities of daily life" such as "lifting, overhead activity, twisting, and working on computers." (R. 419). Additionally, Plaintiff reported the intensity as "severe" and "7-8/10 with worsening headaches." (R. 414). Dr. Bradford noted, "Symptoms appear to be worsening." (R. 419). Listed associated symptoms include "fatigue, headache, joint pain (multiple sites), numbness in arm, numbness in hand, numbness in leg, radiating pain, shoulder pain, sleep disturbances, and weakness in arm." (R. 419). Again, as in the February 2, 2012 notes, Dr. Bradford recorded his observation that Plaintiff "does have some weakness in her right arm and numbness ... in her distal arm and legs." (R. 419). Additionally, Plaintiff reported "symptoms improve with pain medications." (R. 419). Dr. Bradford's ROS notes record that Plaintiff's general exam was "unremarkable with exception of HPI." (R. 419). And his General Exam

24

notes record that Plaintiff was "tired and in moderate pain." (R. 420).

Finally, on October 1, 2012, Dr. Bradford notes during a "recheck" that Plaintiff has continued pain in the cervical and right shoulder region. (R. 463). The pain was described as continuous and worsening with daily activities. Associated symptoms listed include joint pain, numbness and weakness in the hands, arms and legs. (*Id*.)

The ALJ reasonably rejected Dr. Bradford's opinions in view of the fact that his treatment notes – particularly those preceding the opinions – do not support his statements. They contain inconsistencies and are not supported by diagnostic test results. As noted by the ALJ, his conclusions depend significantly upon Plaintiff's subjective complaints. The ALJ's example is instructive:

> For example, except for some slight loss of strength in [Plaintiff's] right grip and induction, and slight atrophy of the right trapezius, every physical examination he performed resulted in normal findings, and on numerous visits [Plaintiff] reported that she had been previously diagnosed and treated with specific medications for symptoms that she reported, which appears to be the only basis upon which Dr. Bradford relied in making his own diagnoses and plan of treatment.

(R. 35). In sum, the ALJ did all she was required to do in this instance and her determination is supported by substantial evidence. *See Snow v. Colvin*, 8 F. Supp. 3d 1345, 1353 (N.D. Ala. 2014) ("Here, the ALJ gave little weight to Dr. Goff's opinion because it was inconsistent with the rest of the record.[] That is all the law

requires him to do.").

Finally, to the extent that Plaintiff complains that the ALJ failed to address Dr. Bradford's MSO, the court is not impressed. (Doc. 8 at 13). While the ALJ's decision does not specifically address the MSO, the court finds that failure to be harmless. The ALJ specifically discussed Dr. Bradford's statements in his April 19, 2011 letter (R. 329) and the associated Clinical Assessment of Pain form (R. 332-33). Dr. Bradford explained in the MSO that Plaintiff's limitations were due to her radiating arm, shoulder, and back pain, which is exactly what the ALJ addressed in her decision. (R. 28-35). Thus, the failure to specifically address the MSO is harmless. *Newberry v. Comm'r of Soc. Sec.*, 572 F. App'x 671, 672 (11th Cir. 2014) ("even if the ALJ erroneously failed to explicitly assign weight to and discuss every aspect of Dr. Giron's opinion, this error was harmless because it is still clear that the ALJ's rejection of the portions of Dr. Giron's opinion that are inconsistent with the ALJ's ultimate conclusion was based on substantial evidence").

**VI. CONCLUSION**

For the reasons set forth above, the undersigned concludes that the decision of the Commissioner is due to be **AFFIRMED**. A separate order in accordance with the memorandum opinion will be entered.

**DATED**, this the 8th day of July, 2015.

JOHN E. OTT
Chief United States Magistrate Judge